IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-20783
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

     v.

ERNESTO URIBE; CARLOS ANTONIO LUJAN;
HUGO A MORA-MEDRANO; EUGENIO AREVALO JR

                                        Defendants-Appellants.


_____

Appeal from the United States District Court
for the Southern District of Texas
_____
                    November 20, 1997
Before KING and JONES, Circuit Judges, and KENDALL,[*] District
Judge.

PER CURIAM:[**]

     Defendants-appellants Ernesto Uribe, Carlos Antonio Lujan,

Hugo A. Mora-Medrano, and Eugenio Arevalo, Jr. were convicted of

several violations of federal drug laws after a lengthy jury

trial.  Raising various claims, each defendant appeals his

conviction; in addition, Arevalo and Uribe appeal their

_____

     [*]     District Judge of the Northern District of Texas,
sitting by designation.

     [**]    Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

sentences.  We affirm the district court's judgment of conviction and sentence as to each defendant-appellant.

## I.  FACTUAL & PROCEDURAL BACKGROUND

This appeal involves a drug smuggling conspiracy, the members of which transported massive amounts of cocaine from Colombia to the United States by way of Mexico.  In a jury trial lasting thirty-three days, five defendants were jointly tried; four of those defendants now appeal.[1]

On March 26, 1994, acting on a tip, Drug Enforcement Agency ("DEA") agents began surveillance on a van parked in front of a shopping center in north Houston.  The agents observed Carlos Peña get into the van and then followed him to a house in Conroe, Texas.  Peña drove the van into the garage and remained there for approximately thirty minutes.  He then drove the van to another shopping center parking lot in The Woodlands, Texas, and entered a restaurant.  Another man got into the van and drove it away.  Surveillance officers stopped the van in Pasadena, Texas and discovered that it contained thirty boxes filled with over 800 kilograms of cocaine.

Later that day, officers arrested Peña at the Conroe house, and he agreed to cooperate with the government.[2]  Under the

---

[1]    This court granted defendant-appellant Joel Chavez-Quezada's motion to dismiss his appeal on October 23, 1996.

[2]    During the course of his cooperation, Peña fled.  He remained a fugitive at the time of trial.

2

direction of the DEA, Peña had conversations with other participants in the conspiracy, including defendant-appellant Ernesto Uribe. Peña consented to the DEA's recording these conversations. Peña also informed the DEA that a 2500 kilogram load of cocaine was expected to arrive at the Conroe house on April 9. The DEA therefore set up surveillance cameras in the garage of the Conroe house.

In the late afternoon of April 9, John Mason arrived at the Conroe house driving a recreational vehicle. On the surveillance videotape, Peña and Mason were observed unloading approximately 125 boxes of cocaine from the recreational vehicle into the garage. The next day, Peña loaded some of the boxes into a van that was in the garage and drove the van to a shopping center in The Woodlands. Jose Davila then drove the van to a house in Houston. When the van was later searched, it was found to be empty.

On April 11, agents observed Davila driving a small blue pickup truck with a camper on it from the garage of the Houston house to a McDonald's restaurant. Davila went into the McDonald's. Approximately an hour to an hour and a half later, defendant-appellant Eugenio Arevalo, Jr. arrived in a taxi and entered the McDonald's. Arevalo returned to the parking lot approximately five minutes later and drove away in the blue pickup truck that Davila had driven from the Houston house. Agents pursued Arevalo and arrested him near the McDonald's.

3

Their search revealed seventeen boxes filled with 340.7 kilograms of cocaine.

Meanwhile, on April 10, a DEA agent followed Mason on an airplane from Houston to El Paso.  Upon arriving in El Paso, Mason went to a Quality Inn.  Defendant-appellant Hugo A. Mora-Medrano later picked Mason up at the Quality Inn, but agents observed no further drug activity.  The next day, Rodrigo Herrera picked Mason up at the Quality Inn.  After Mason and Herrera met Mora-Medrano at a restaurant, Herrera took Mason to an El Paso house.  At the house, Mason and others loaded 2400 kilograms of cocaine into a recreational vehicle.

Mason, Mora-Medrano, and defendant-appellant Carlos Antonio Lujan left El Paso in a three-vehicle convoy.  Mora-Medrano drove the lead vehicle, Mason drove the recreational vehicle, and Lujan followed in another vehicle.  Law enforcement agents followed the caravan for approximately forty miles before they stopped and arrested the suspects in Hatch, New Mexico.  Uribe, Herrera, and Jose Chavez-Quezada, the leader of the conspiracy, were also arrested on April 11.[3]  On November 14, 1994, Uribe, Lujan, Mora-Medrano, Arevalo, and four other defendants were named in a seven-count superseding indictment by a federal grand jury.[4]

_____

[3]     Agents arrested Uribe at Houston Intercontinental Airport as he was attempting to leave the city.  Herrera and Chavez-Quezada were arrested in El Paso.

[4]     Count One charged all of the defendants with conspiracy to possess with intent to distribute in excess of five kilograms

4

Much of the direct evidence that the government presented at trial as to the extent of the conspiracy prior to March 1994 involved the testimony of the cooperating co-defendants Mason and Herrera. Their testimony established that Chavez-Quezada was the leader of a vast narcotics organization headquartered in Juarez, Mexico. Herrera was in charge of distribution and arranged the transportation of the cocaine at Chavez-Quezada's direction.

Herrera testified extensively about the start of his association with Chavez-Quezada. He testified that he began arranging cocaine transportation for Chavez-Quezada in May 1991 and that Mora-Medrano was involved in the conspiracy from that time forward. Herrera later recruited John Mason to join the conspiracy. The remainder of his testimony corroborated Mason's testimony.

Mason testified that he participated in numerous cocaine

---

of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). Count Two charged Uribe, Mora-Medrano, Lujan, and three other defendants with aiding and abetting and with possession with intent to distribute in excess of five kilograms of cocaine on March 15, 1994 in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. Counts Three, Five, and Seven charged Uribe with distribution of cocaine on March 26, April 10, and April 11, 1994 in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. Count Four charged Uribe, Mora-Medrano, Lujan and one other defendant with aiding and abetting and with possession with intent to distribute in excess of five kilograms of cocaine on April 9, 1994 in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. Count Six charged Arevalo with possession with intent to distribute in excess of five kilograms of cocaine on April 11, 1994 in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2.

5

transportation trips between the summer of 1993 and his arrest in April 1994. His job consisted of picking up the loads of cocaine in El Paso and delivering them to Houston, Chicago, or Los Angeles. Each load consisted of anywhere from 800 to 2400 kilograms of cocaine that was transported in a recreational vehicle either purchased or rented by Mason. Mora-Medrano accompanied Mason on each of these trips. According to Mason, Mora-Medrano's job was to drive the lead vehicle and inform Mason of any obstacles that might interfere with his delivery of the cocaine to the destination city. Mason also testified that Lujan joined the conspiracy for the last three trips, sometimes accompanying Mora-Medrano in the lead car and sometimes driving the car that followed the recreational vehicle.

The jury convicted Uribe, Lujan, and Mora-Medrano on all counts. Arevalo was acquitted on Count One but was convicted on Count Six.

## II. DISCUSSION

Each defendant-appellant appeals several aspects of his conviction. First, Arevalo claims that the district court erred in refusing to suppress evidence seized during his arrest. Second, Mora-Medrano challenges the district court's decision to excuse Venireman #12 based on the government's challenge for cause. Third, Uribe asserts that the district court erred in admitting tape recorded statements made by Peña during one of

6

Uribe's conversations with him.  Fourth, Arevalo argues that the district court erred in giving the jury a "deliberate indifference" instruction and in using the term "real doubt" in its definition of reasonable doubt.  Fifth, Mora-Medrano challenges the district court's refusal to grant him a mistrial based on a comment made by the prosecutor.  Sixth, Mora-Medrano and Lujan argue that they were entitled to a new trial because extraneous material was taken into the jury room during deliberations.  Seventh, Uribe, Lujan, and Arevalo each claims that the evidence presented at trial was insufficient to support his conviction.  Finally, Arevalo and Uribe appeal the sentences imposed upon them by the district court.  We address each of these issues in turn.

## A.    *Suppression of Evidence*

Arevalo argues that the district court erred in dismissing his motion to suppress the evidence seized from the blue pickup truck that he was driving when he was arrested.  He claims that the officers lacked probable cause as required for a warrantless arrest and that the arrest and the incident search were therefore unlawful.

A warrantless arrest requires probable cause, which exists "when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or

7

was committing an offense." United States v. Wadley, 59 F.3d 510, 512 (5th Cir. 1995), cert. denied, 117 S. Ct. 240 (1996). Absent clear error, we will not disturb the factual findings underlying the district court's determination that probable cause existed. Id. However, the ultimate determination of whether probable cause existed is a question of law that we review de novo. Id. We have reviewed the testimony presented at the suppression hearing and find that probable cause existed to justify the arrest of Arevalo and the search of the blue pickup truck.

## B. *Excusal of Venireman #12 for Cause*

Mora-Medrano argues that the district court erred by granting the government's challenge for cause to Venireman #12. During voir dire, the government asked the prospective jurors whether they could fairly listen to and evaluate the testimony of a witness who had pled guilty and agreed to cooperate with the government. Despite focused attempts by both defense counsel and the district court to rehabilitate Venireman #12, he maintained that he would be unable to keep an open mind about the testimony of such a witness.

"We review the district court's ruling as to juror impartiality only for manifest abuse of discretion." United States v. Munoz, 15 F.3d 395, 397 (5th Cir. 1994). Having reviewed the record, we find that the district court did not

manifestly abuse its discretion in granting the government's challenge for cause as to Venireman #12.

## C.    *Evidentiary Ruling*

Uribe asserts that the district court erred in admitting, over his objections, tape recorded statements made by Peña during Uribe's conversations with him.  He claims that Peña's statements on the tapes were more prejudicial than probative and therefore should have been excluded under Federal Rule of Evidence 403.  He further argues that the admission of out of court statements made by Peña, who was not available at trial and therefore was not subject to cross examination, led to a confusion of the issues and created the serious potential that the jury was misled.  We disagree.

A district court has broad discretion to assess admissibility under Rule 403, and we will overturn its determination only where it has abused that discretion.  United States v. Morris, 79 F.3d 409, 412 (5th Cir. 1996).  The district court explicitly rejected Uribe's claim that the statements were more prejudicial than probative and created a serious possibility of jury confusion.  In admitting the statements, the district court relied on United States v. Gutierrez-Chavez, 842 F.2d 77 (5th Cir. 1988).  In Gutierrez-Chavez, this court held that statements taken from tape-recorded conversations between a defendant and a third-party co-defendant are admissible "for the

9

limited purpose of putting the responses of the appellant in context and making them 'intelligible to the jury and recognizable as admissions.'" Id. at 81 (quoting United States v. Lemonakis, 485 F.2d 941, 948 (D.C. Cir. 1973)). The district court's admission of the statements made by Peña on that basis was not an abuse of discretion.

## D.   *Jury Instructions*

Arevalo appeals two aspects of the jury charge. In reviewing a challenge to jury instructions, we must determine "'whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" United States v. Gray, 105 F.3d 956, 967 (5th Cir.) (quoting United States v. August, 835 F.2d 76, 77 (5th Cir. 1987)), cert. denied, 117 S. Ct. 1856 (1997).

Arevalo first argues that the district court erred in giving the jury a "deliberate ignorance" instruction with respect to the charges against him. He claims that no evidence was presented at trial that could support the inference that he wilfully blinded himself to the fact that he was involved in a drug transaction. In response, the government argues that the facts surrounding Arevalo's picking up the truck at the McDonald's before his arrest support an inference that he was subjectively aware of a high probability of the existence of illegal conduct and

10

purposely contrived to avoid learning of it.

In determining whether a deliberate ignorance instruction can be given, this court employs a two part test. "'The evidence must show that: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct.'" United States v. Faulkner, 17 F.3d 745, 766 (5th Cir. 1994) (quoting United States v. Ojebode, 957 F.2d 1218, 1229 (5th Cir. 1992)). In order to satisfy this test, the government need not necessarily prove that the defendant engaged in affirmative acts in order to avoid knowledge. Id. "[I]n some cases the likelihood of criminal wrongdoing is so high, and the circumstance surrounding a defendant's activities and cohorts are so suspicious, that a failure to conduct further inquiry or inspection can justify the inclusion of the deliberate ignorance instruction." Id. Viewing the evidence in the record in the light most favorable to the jury's verdict, see id. at 766 n.31, we cannot say that including a deliberate ignorance instruction constituted error on the part of the district court.

Second, Arevalo argues that the district court's use of the term "real doubt" in its definition of reasonable doubt was improper and created a likelihood that the jury was misled and rendered an improper verdict.[5] This argument lacks merit. Other

---

[5] The instruction given to the jury by the district court read as follows:

11

than the addition of the word "real," the charge that the district court gave to the jury follows the Fifth Circuit Pattern Jury Instructions. Moreover, this circuit and other circuits have approved of the use of the term "real doubt" to define "reasonable doubt." See United States v. Alonzo, 681 F.2d 997, 1002 (5th Cir. 1982); see also, e.g., United States v. Oreto, 37 F.3d 739, 753 (1st Cir. 1994). The district court did not err in including the term "real doubt" in its definition of reasonable doubt.

**E.    *Denial of Motion for a Mistrial***

Mora-Medrano claims that the district court erred by refusing to grant his motion for a mistrial based on the following comment that was made by the prosecutor:

> This idea of when they brought character witnesses to testify to the good character of some of the defendants, and that we could have--it opened the door to bring in witnesses to say they're bad people, the only problem with that is the only people we could bring in to testify to that are people that are in the same drug business as they are.

At trial, the district court sustained the defense's objection to this comment and admonished the jury to disregard it. Nevertheless, the district court denied the defense's motion for

---

"A reasonable doubt" is a real doubt, based upon reason and common sense, after a careful and impartial consideration of all the evidence in the case.
"Proof beyond a reasonable doubt" is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

12

a mistrial, both at the time of the comment and when the issue was later revisited, stating that it had given the jury a "strong admonition to disregard" the comment and that, "in the context of all of the instructions that the jury has been given, and the specific response made during the argument to [the] objection at the time it was raised, . . . [the rights] of all the defendants in this case have been properly protected."

The district court is in the best position to determine whether it is necessary to grant a mistrial on the basis of alleged prosecutorial misconduct, and "'[a] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.'"  United States v. Rocha, 916 F.2d 219, 234 (5th Cir. 1990) (quoting United States v. Lowenberg, 853 F.2d 295, 302 (5th Cir. 1988)).  We review a district court's ruling on a motion for a mistrial for abuse of discretion.  Id. Improper prosecutorial remarks constitute reversible error only if they "cast serious doubt on the jury's verdict."  United States v. Bustamante, 45 F.3d 933, 946 (5th Cir.), cert. denied, 116 S. Ct. 473 (1995).  In making this determination, this court considers three factors:  "(1) the likelihood and degree that the jury was prejudiced by the remarks; (2) the effectiveness of any cautionary instructions given by the court; and (3) the strength of the legitimate evidence of the defendant's guilt."  Id.

In this case, the prosecutor's statement does not cast serious doubt on the correctness of the jury's verdict.  The

13

comment was an isolated one and the district court sustained the defense's objection to it and promptly admonished the jury to disregard it. In addition, the government presented strong evidence of Mora-Medrano's guilt, including the corroborated testimony of both Herrera and Mason and the fact that when arrested he was driving the lead vehicle in the convoy that was transporting the cocaine. We therefore find that the district court did not err in denying Mora-Medrano's motion for a mistrial.

## F.   *Denial of Motions for a New Trial*

After the jury vacated the jury deliberation room, the parties discovered several extraneous items that had been marked as government exhibits but had not been admitted into evidence. The items included National rental car records pertaining to Chavez-Quezada, an Avis rental car record for Uribe, a Dollar rental car record for Uribe, and D.T.C. Travel Agency records showing one reservation for Mora-Medrano and ten reservations for Herrera. Handwritten on the travel agency records were the words, "No invoices listed for Velasco/Ismael." In addition, the parties found sixteen pages of Continental Airlines records that included documentation of a reservation for two people under "Lujan/Carlos/A" on an April 9, 1994 flight from Houston to El Paso.

Chavez-Quezada filed a motion for new trial based on the

14

presence of unauthorized material in the jury room during deliberations. The district court permitted Lujan to adopt Chavez-Quezada's motion for new trial in lieu of filing his own. Mora-Medrano filed his own motion for new trial on the same basis.

At the hearing on the defendants' motions, Lujan claimed that all of the extraneous material prejudiced him, and he argued specifically that the Continental Airlines records were prejudicial because they tended to discredit his theory that Velasco and another individual were on the April 9, 1994 airplane flight to El Paso rather than him. Mora-Medrano's motion claimed that the travel agency records listing prepaid tickets for him and for Herrera linked him with alleged co-conspirators Herrera and Velasco. He argued that this exhibit could have influenced the jury and supplied the corroboration the jury might have felt they needed to convict him.

The district court denied the motions for new trial, noting that before jury deliberations began it had repeatedly instructed the attorneys for both sides to review the exhibits carefully to ensure that only the admitted exhibits were sent to the jury room. The district court therefore concluded that defense counsel's failure to effectively review the documents after repeated instructions to do so constituted waiver by failure to exercise due diligence. In the alternative, the court held that even if no waiver occurred, the extraneous materials did not

15

affect the verdict because there was sufficient evidence of the defendants' guilt to make the extraneous material harmless as a matter of law.[6]

Absent an abuse of discretion, we will not overturn a district court's ruling on a motion for new trial on the ground that extrinsic material prejudiced the defendants. United States v. Sanchez-Sotelo, 8 F.3d 202, 212 (5th Cir. 1993). When extraneous material is found in the jury room, the district court must inquire into how it came to be there, whether the jurors have seen it, and whether there is a reasonable possibility that it influenced the jury's verdict. See United States v. Luffred, 911 F.2d 1011, 1015 n.3 (5th Cir. 1990). "[A] defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room 'unless there is no reasonable possibility that the jury's verdict was influenced by the material that improperly came before it.'" Id. at 1014 (quoting Llewellyn v. Stynchombe, 609 F.2d 194, 195 (5th Cir. 1980)). Factors that are relevant to this determination include "the content of the extrinsic material, the manner in which it came to the jury's attention, and the weight of the evidence against the defendant." Id. There is a rebuttable presumption that extraneous material is prejudicial to the defendant, and the government bears the

---

[6] For purposes of this motion, the district court assumed that the jury "was exposed to and considered the materials at issue."

16

burden of proving harmlessness.  Id.  However, extraneous material that is cumulative of properly admitted evidence is not prejudicial.  Llewellyn, 609 F.2d at 196.

**(1)  Mora-Medrano**

Mora-Medrano argues that he was prejudiced by the extrinsic material because it corroborated "the heavily attacked testimony of Mason and Herrera, co-operating co-defendants whose credibility had been seriously damaged otherwise."  At the hearing below, he specifically argued that the D.T.C. Travel records prejudiced him because they indicated that he had purchased a pre-paid airline ticket for travel on January 10, 1994 and thereby corroborated Herrera's testimony regarding his actions on that date.  In addition, he contended that the handwritten notation regarding co-defendant Velasco served to associate him with Velasco.

At trial, the government introduced a significant amount of evidence which is relevant to this issue.  The testimony of Mason and Herrera indicated that Mora drove the lead vehicle in each drug transportation trip.  Hotel records corroborated this testimony by indicating that Mora-Medrano was in Houston on the dates that Mason and Herrera testified drug transportation trips arrived there.  In addition, officers observed Mora-Medrano meeting with Herrera and Mason in El Paso just prior to Herrera and Mason going to the El Paso house.  Finally, Mora-Medrano was

17

arrested in Hatch, New Mexico while driving the lead vehicle in the transportation convoy.  Given the significant amount of evidence indicating that Mora-Medrano was deeply involved in the conspiracy, we conclude that the district court's determination that the jury's consideration of the travel agency document was harmless did not constitute an abuse of discretion.

**(2)  Lujan**

Lujan argues on appeal that all of the extraneous material prejudiced him because "the documents tended to link Mr. Lujan to Herrera through an association with Mora[-Medrano]."  The government responds that the only item that could possibly have prejudiced Lujan was the Continental Airlines record that showed a reservation for two people in his name on an April 9, 1994 flight from Houston to El Paso.

When the jury receives extrinsic evidence that "links the defendant to the offense with which he is charged or impeaches the defendant or one of his witnesses and the material is not merely cumulative, prejudicial error requiring reversal may result."  Martin v. Estelle, 541 F.2d 1147, 1148 (5th Cir. 1976).  With the exception of the Continental Airlines record, none of the extrinsic material mentioned Lujan or linked him to the offense with which he is charged.  The government claims that the Continental Airlines record was cumulative because in its rebuttal it introduced the tickets and reservation documents from

18

the same flight indicating that two people identified to the airline as Carlos and A. Lujan took the April 9, 1994 flight.[7] Given the fact that this evidence documented the same event as the extrinsic material in question, we conclude that the district

_____

[7] Lujan claims that because the tickets were admitted in violation of Federal Rule of Criminal Procedure 16(a)(1)(C), they cannot be considered properly admitted evidence. He therefore argues that the airline record that was mistakenly taken into the jury room cannot be considered merely cumulative of properly admitted evidence. We disagree.

Lujan has not challenged the admission of the tickets and reservation records directly; he does so only in one portion of his argument regarding the extrinsic material that was taken into the jury room. Even assuming that this point is properly raised, however, we think that the district court's admission of the tickets was proper. Rule 16(a)(1)(C) requires that the government disclose documents and tangible objects "which are within the possession, custody, or control of the government and which are material to the preparation of the defendant's defense." FED. R. CRIM. PRO. 16(a)(1)(C).

The trial record indicates that the rebuttal witness, the custodian of records at Continental Airlines, brought the tickets with him on the day of his testimony and the government did not have access to them prior to its examination of the witness. In its rebuttal, the government introduced reservations records from Continental Airlines through the witness's testimony. During the government's examination of the witness, defense counsel took the witness on voir dire and proceeded to question him regarding whether the reservation records would indicate whether the person who reserved the ticket was actually on the flight. When pursuing this line of questioning, defense counsel was aware that the government was in possession of the tickets that were collected when the airplane was boarded. Thus, because defense counsel opened the door to the issue and was aware of the tickets when it did so, the district court's decision to admit the tickets was not improper. Cf. United States v. Delk, 586 F.2d 513, 519 (5th Cir. 1978) (holding that license tag receipts which were not disclosed to the defense prior to their introduction at trial, through no fault of the government, were properly admitted in the government's rebuttal case because the defense opened the door by focusing on the lack of physical evidence).

19

court did not abuse its discretion in denying Lujan's motion for new trial.

## G.    *Sufficiency of the Evidence*

Uribe, Lujan, and Arevalo argue that the evidence was insufficient to sustain their convictions for the crimes with which they were charged.  In considering challenges to the sufficiency of the evidence, this court reviews the evidence, whether direct or circumstantial, in the light most favorable to the jury verdict.  United States v. Resio-Trejo, 45 F.3d 907, 910 (5th Cir. 1995).  Moreover, we resolve all credibility determinations and reasonable inferences to be drawn therefrom in favor of the verdict.  Id. at 911.  The evidence is sufficient to support the verdict if a reasonable trier of fact could have found the essential elements of the crime to be proven beyond a reasonable doubt.  Id.  We address the claims of each defendant in turn.

### (1)  Uribe

Uribe argues that the government's evidence was insufficient to prove that he was part of the drug conspiracy.  "'To establish the offense of a drug conspiracy, the Government must prove beyond a reasonable doubt that a conspiracy existed, that the accused knew of the conspiracy, and that he voluntarily joined it.'"  United States v. Dean, 59 F.3d 1479, 1485 (5th Cir. 1995) (quoting United States v. Limones, 8 F.3d 1004, 1009 (5th Cir.

20

1993)), <u>cert. denied</u>, 116 S. Ct. 794 (1996). While the government may prove these elements through circumstantial evidence, "'we have repeatedly stressed that we will not lightly infer a defendant's knowledge of and participation in a conspiracy.'" <u>Id.</u> (quoting <u>United States v. Maltos</u>, 985 F.2d 743, 746 (5th Cir. 1992)). Thus, evidence that it is more likely than not that the defendant knowingly joined a conspiracy is not sufficient to prove the government's case beyond a reasonable doubt. <u>Id.</u>

Uribe maintains that he is a legitimate businessman whose only interaction with the members of the conspiracy was purchasing used automobiles from them. At trial, Herrera testified that Uribe was responsible for receiving the drugs on behalf of Chavez-Quezada upon their arrival in the destination city. Herrera's testimony was corroborated by the fact that, when arrested, Uribe's wallet contained Peña's pager number and cellular phone number. Moreover, Uribe's pager number was found in Herrera's electronic organizer and on a piece of paper found at one of the stash houses.

In addition, Mason testified extensively as to the dates that he made drug deliveries to different cities. Hotel receipts indicated that on several occasions Uribe was in those cities when Mason made the deliveries. Mason also testified that on two different occasions he delivered cocaine to Victorville, California and that he was told that Victorville had been chosen

21

because the people who were receiving the drugs lived there. Documentary evidence indicated that Uribe lived in Victorville. Finally, the government introduced into evidence taped conversations in which Peña and Uribe discussed the logistics of the exchange of the vans.

"[A] guilty verdict may be sustained if supported only by the uncorroborated testimony of a co-conspirator, even if the witness is interested due to a plea bargain or promise of leniency, unless the testimony is incredible or insubstantial on its face." United States v. Bermea, 30 F.3d 1539, 1552 (5th Cir. 1994). In this case the testimony of the co-conspirators was supported by other evidence admitted at trial. When viewed in the light most favorable to the verdict, the evidence admitted at trial was sufficient to allow a reasonable jury to conclude that a conspiracy existed and that Uribe knowingly and voluntarily joined it.

**(2) Lujan**

Lujan contends that the evidence presented at trial was insufficient to allow a reasonable jury to find that he was guilty of the offenses of drug conspiracy, drug possession, and aiding and abetting. As noted above, in order to prove the offense of drug conspiracy, the government must prove beyond a reasonable doubt that a conspiracy existed and that the defendant knowingly and voluntarily joined it. Dean, 59 F.3d at 1485. In

22

order to sustain a conviction for aiding and abetting a drug possession with intent to distribute, the government must prove both the offense of aiding and abetting and the offense of drug possession. "The elements for possession of drugs with intent to distribute are as follows: (1) knowledge of the contraband, (2) possession of the contraband, and (3) intent to distribute the contraband." United States v. Pedroza, 78 F.3d 179, 183 (5th Cir. 1996). In order to prove the aiding and abetting aspect of the charge, the government was required to show (1) Lujan's association in the criminal activity, (2) his participation in it, and (3) the actions that he took for the purpose of making the criminal activity succeed. Id.

At trial, Mason testified that Lujan participated in three different drug transportation trips and that on two of those trips, Lujan drove the lead vehicle. This testimony was corroborated by airline records indicating that Lujan flew from Houston to El Paso on April 9, 1994, just two days before the April 11 trip during which he was arrested. Mason also testified that when he, Lujan, and Mora-Medrano were being held together prior to their arraignment, Lujan told him to "keep his mouth shut." In addition, Herrera testified that Lujan was a member of the organization and that during one of the trips Lujan answered the mobile phone when Herrera called the car. Finally, when Lujan was arrested, phone numbers of other members of the conspiracy were found in his wallet. Viewed in the light most

23

favorable to the jury's verdict, we think the evidence admitted at trial was sufficient to allow the jury to find Lujan guilty on all three counts.

**(3) Arevalo**

Arevalo challenges the sufficiency of the evidence supporting his conviction for possession with intent to distribute in excess of five kilograms of cocaine. As noted above, in order to establish that a defendant is guilty of possession with intent to distribute, the government must prove that the defendant had knowledge and possession of the contraband and that he intended to distribute it. <u>Pedroza</u>, 78 F.3d at 183. Possession of a quantity of drugs too large for ordinary consumption suggests an intent to distribute. <u>See</u> <u>United States v. Pineda-Ortuna</u>, 952 F.2d 98, 102 (5th Cir. 1992).

The evidence admitted at trial indicated that Arevalo was dropped off by a taxicab at a McDonald's restaurant and went briefly inside. When he exited the McDonald's, he drove away in a blue pickup truck that DEA agents had followed from a house that had received a delivery of cocaine on the previous day. Moments later, Arevalo was stopped and arrested, and 340.7 kilograms of cocaine were found in the vehicle.

Although Arevalo, a mechanic, testified that he had been called to pick up the truck because it had mechanical problems, DEA officers found no evidence of such problems, Arevalo did not

inspect the truck before driving it away, and he did not have tools with him when he was arrested. Further, he claimed that he did not get the name of the owner or the truck's exact location before leaving to pick it up at the McDonald's. In addition, his shop was located approximately thirty miles from the McDonald's where he picked up the truck, and he was arrested after exiting the freeway at a different exit than the one that would have led back to his shop. This evidence was sufficient for a reasonable jury to find Arevalo guilty of the crime of possession of cocaine with intent to distribute.

## H.   *Application of the Sentencing Guidelines*

Arevalo and Uribe challenge the sentences imposed upon them by the district court. We will uphold a sentence imposed under the sentencing guidelines if it is the result of a correct application of the guidelines to factual findings that are not clearly erroneous. United States v. Atanda, 60 F.3d 196, 198 (5th Cir. 1995).

### (1)  Arevalo

Arevalo argues that the district court erred in refusing to grant him a four-point reduction in his offense level pursuant to § 3B1.2 of the Sentencing Guidelines. Section 3B1.2 provides for a four-point reduction where the defendant was a "minimal" participant in the criminal activity and a two-point reduction where the defendant was a "minor" participant. U.S. SENTENCING

GUIDELINES § 3B1.2.  This provision is not applicable to Arevalo.

Arevalo's participation in the criminal activity was limited to driving a single truckload of cocaine that amounted to less than one percent of the total amount allegedly involved in the conspiracy.  However, Arevalo was acquitted on the conspiracy charge; he was found guilty only of possession with intent to distribute 340.7 kilograms of cocaine.  His sentence therefore was based entirely on his possession of the drugs, an activity in which he clearly was involved.  "[W]hen a sentence is based on an activity in which a defendant was actually involved, § 3B1.2 does not require a reduction in the base offense level even though the defendant's activity in a larger conspiracy may have been minor or minimal."  Atanda, 60 F.3d at 199.  Thus, the district court did not err in refusing to reduce Arevalo's offense level.

**(2)  Uribe**

Uribe contends that the district court erred by increasing his offense level by three points pursuant to § 3B1.1(b) of the Sentencing Guidelines.  Section 3B1.1(b) provides that the defendant's offense level should be increased by three levels if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  U.S. SENTENCING GUIDELINES § 3B1.1(b).  Uribe contends that § 3B1.1(b) does not apply to him because under the government's theory he was merely a driver

26

without any real authority in the conspiracy.  Further, he disputes the finding that there were five people working under him in the conspiracy.

A district court's determination that a defendant is an organizer, leader, manager, or supervisor under § 3B1.1 is a factual finding which this court reviews only for clear error. See United States v. Giraldo, 111 F.3d 21, 23 (5th Cir.), cert. denied, 66 U.S.L.W. 3282 (Oct. 14, 1997); United States v. Valencia, 44 F.3d 269, 272 (5th Cir. 1995).  "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole."  Valencia, 44 F.3d at 272.

In sentencing Uribe, the district court adopted the Presentence Investigation Report's finding that he was a manager or supervisor in the conspiracy.  A Presentence Investigation Report "'generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making the factual determinations required by the guidelines.'"  United States v. Jobe, 101 F.3d 1046, 1065 (5th Cir. 1996) (quoting United States v. Elwood, 999 F.2d 814, 817 (5th Cir. 1993)), cert. denied, 118 S. Ct. 81 (1997).  Having reviewed the record and the Presentence Investigation Report, we cannot say that the district court's factual determination that Uribe was a manager or supervisor was clearly erroneous.  We therefore find that the district court did not err in increasing Uribe's offense level by three points pursuant to § 3B1.1(b) of the Sentencing Guidelines.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment of conviction and sentence as to each defendant-appellant.